IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

DEBORAH K. BENTON                                                                                  PLAINTIFF

V.                               CIVIL NO. 5:08-5254

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY                                                  DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Deborah K. Benton, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (Act).

**Procedural Background**

Plaintiff filed applications for Social Security benefits under Title II and Title XVI of the Act on September 19, 2007, alleging an onset date of January 2, 2007. (Tr. 90-92). On September 27, 2007, Plaintiff filed an amended application, alleging an onset date of July 1, 2006. (Tr. 95-96). The application was denied initially and upon reconsideration. (Tr. 60-62, 65-66). Pursuant to Plaintiff's request, a hearing was held before the Administrative Law Judge (ALJ) on June 19, 2008, where Plaintiff and a Vocational Expert (VE) appeared and testified. (Tr. 6-43). By written decision dated

August 20, 2008, the ALJ found that Plaintiff was not disabled within the meaning of the Act, and was therefore not entitled to benefits. (Tr. 46-59). The Appeals Council denied Plaintiff's request for review on October 7, 2008. (Tr. 2-4). Plaintiff now seeks judicial review of that decision.

**Evidence Presented**

Plaintiff was born on June 18, 1957, received her GED and later became a licensed nurse. (Tr. 8-9). She alleged that she was raped and drugged when she was twenty-five years old and has had twelve nervous breakdowns since then. (Tr. 21). She began seeking treatment from Dr. Kim Emerson ten years ago and Dr. Ester Salvador at the Ozark Guidance Center (OGC) twenty-five years ago. (Tr. 21). Plaintiff stopped working in July of 2006, and alleged that she had been fired from four jobs because she was too slow, could not keep up anymore and that her illness had come to a head. (Tr. 19). She stated that she could not focus and was having hallucinations and hearing voices, suffered from paranoia schizophrenia and manic depression. (Tr. 20-21).

Plaintiff was married six times (divorced her sixth husband in April of 2008) and has three grown children. (Tr. 199, 23-25). At the time of the hearing, Plaintiff was taking medicine for depression, paranoia, schizophrenia, bipolar, insomnia, constipation, a prolapsed mitral heart valve, anxiety and hormones. (Tr. 26). She stated that the antidepressant caused the insomnia and the other medications caused drowsiness, inability to focus and blurred vision. (Tr. 27). She also said that she felt really tired and fatigued all the time. (Tr. 27). Plaintiff and her most recent husband purchased a Bed and Breakfast in 2007 in Rogers, Arkansas, where she now lives, and her children assist her with most of the work. (Tr. 30-35).

On February 20, 2007, Plaintiff was admitted to St. Mary Rogers Memorial Hospital, talking about wanting to die and go see Jesus. (Tr. 186). She believed everyone was trying to kill her and

had suicidal thoughts. (Tr. 186). The clinical impression was depression and major paranoid ideation. (Tr. 187). She was then referred to Vista Health, where she stayed from February 21, 2007, to February 27, 2007. (Tr. 199-203). The initial psychiatric assessment history and physical, signed by Brian Tankersley, P.A.C., and Dr. Fayz Hudefi found Plaintiff to be very psychomotor retarded. (Tr. 193). At that time, Plaintiff smoked one and a half packs of cigarettes a day, her judgment was impaired, she demonstrated poor insight and was very confused. (Tr. 194-195). Her GAF was 18 and she was found to have psychosis, depression and paranoia. (Tr. 195). Plaintiff reported being depressed for at least seven months, being more isolated, feeling down and disheartened with a low spirit. (P. 199). Plaintiff attributed this depression to the fact that she was dealing with a husband who was an alcoholic, and had been unable to stay on Zoloft, Prozac and Paxil because she was unable to sleep. (Tr. 199). Her condition was assessed as major depressive disorder with psychotic features, recurrent. (Tr. 199). Dr. Hudefi started Plaintiff on Cymbalta 30 mg. once a day for two days, which she was to then increase to 30 mg. twice a day, and Geodon 20 mg. twice a day for 24 hours, which she was then to increase to 40 mg. twice a day. It was also noted that Plaintiff suffered from hypothyroidism and had been off of her Synthroid, and the Synthroid was initiated again. (Tr. 201). By the end of her stay at Vista Health, Plaintiff was not having any suicidal statements, but did still feel that her husband was trying to kill her. She was not experiencing any side effects from her medications, but her affect was still very flat . It was felt that Plaintiff required further inpatient psychiatric hospitalization to ensure her safety. (Tr. 203).

In the Vista Health Discharge Summary dated February 27, 2007, the discharge diagnoses was:

- AXIS I: PRIMARY PSYCHIATRIC DIAGNOSIS - Mood disorder, NOS. Psychosis, NOS

- AXIS II: Personality Factors - None

- AXIS III: Physical Factors - Hypothyroidism. History of prolapsed heart valve

- AXIS IV: psychosocial stressors - Relationship and lack of primary support.

- AXIS V: GLOBAL ASSESSMENT OF FUNCTIONING - GAF on admission was 18. Current is 65. Highest in the past year was 75.

(Tr. 191). Plaintiff's condition on discharge was "stable" and the qualified prognosis was "good." (Tr. 192).

On December 17, 2007, Plaintiff presented to the Emergency Room of the Northwest Medical Center, for a suicide attempt and intentional drug overdose. (Tr. 302). The ER record reflected that Plaintiff lived with an alcoholic husband who threatened to take away her property and business, she could not sleep and took too many Larazapam and Geodon. (Tr. 310). In the personal history & physical exam report completed by Dr. Mark T. Robinson, his impression was a medication overdose, although he noted that Plaintiff told him later in the day that she was not trying to harm herself. (Tr. 312).

The medical records indicate that Plaintiff was seen by her treating physician, Dr. Kim Emerson, and counselors at the OGC, including Dr. Ester Salvador, numerous times and on a regular basis before and after her February and December emergency room visits. There were times when she would either maintain current progress, have mixed progress or limited progress. (Tr. 230, 232, 238, 250, 254, 256, 258, 294, 339-341, 344-346, 393-394, 395-400, 401-402, 403-405, 406-408, 409-410, 411-413, 414-415, 416-417, 418-420, 422-423, 424-425, 426-427, 475-480, 481-483, 487-488, 489-491, 492-494, 495-496, 497-499, 500-501, 502-503, 504-506, 507-508, 509-510, 511-512, 580-

582, 585-587). Dr. Emerson noted on March 12, 2007, that although the Cymbalta made Plaintiff feel better, she nevertheless complained of depressed mood, malaise, constant fatigue, loss of enjoyment in usually pleasurable activity, and had difficulty sleeping. (Tr. 214). Her mood was depressed and her affect was flat. (Tr. 215). On April 13, 2007, Dr. Emerson noted that Geodon had been discontinued but the Cymbalta was working great. Plaintiff was making progress and felt better. (Tr. 217). On June 21, 2007, Dr. Emerson recorded that Plaintiff felt that the Cymbalta was controlling the depression well for what she had been going through (her mother just had her leg amputated). (Tr. 219). On May 31, 2007, Plaintiff advised the counselor at OGC that things were not going well in her marriage, and it was determined that her overall progress was limited as evidenced by the increase in negative feelings of depression and low self-worth. (Tr. 250). On December 20, 2007, Dr. Salvador of the OGC noted that Plaintiff stated that she could not work because of her depression, paranoia and anxiety. Dr. Salvador increased the Cymbalta dosage from 60 mg. to 90 mg. Dr. Salvador also noted that Plaintiff appeared to be more overwhelmed by her experience with the hospital and seemed to be strangely "ok" that day. However, Dr. Salvador found Plaintiff was decompensating. "Decompensation as evidence by recent events and observation. Based on this week, client is decompensating due to reported increase in anxiety/depression and then self-induced overdose." (Tr. 396). On January 23, 2008, Tiffany McCullough, LCSW, an OGC counselor, found Plaintiff had made no progress and was close to reporting decompensation. (Tr. 405).

On February 4, 2008, Plaintiff presented herself to Dr. Emerson, telling Dr. Emerson about her recent nervous break down.[1] (Tr. 339). Plaintiff described feelings of tenseness, edginess, constant underlying anxiety, and the inability to relax. (Tr. 339). Dr. Emerson's assessment was: bipolar effective disorder (manic-depressive), post traumatic stress disorder, tachycardia, palpitations, and paranoid schizophrenia. (Tr. 340). In her plan, Dr. Emerson told Plaintiff to avoid stimulants and that she was happy that Plaintiff had been seeing Dr. Salvador. (Tr. 340). Dr. Emerson also noted:

> You are unable to do any work of any kind and are unable to learn a new skill due to decreased focus and attention, inability to store new memory and access old memory. This is in part due to the post-traumatic stress disorder and the bipolar disorder but also due to the medications you are taking.

(Tr. 340).

On June 17, 2008, in a Social Security Medical Source Statement - Mental report, completed by Dr. Salvador, Dr. Salvador found Plaintiff was markedly limited in numerous areas, and did not have the capacity to perform certain work related mental activities on a sustained basis. (Tr. 428-430). Dr. Salvador explained further:

> Client shows extreme marked inability to think clearly and focus in all task related activities. Extreme emotional instability with anxiety. Frequent psychosis with symptoms that require immediate intervention to reduce crisis situation. Inability to function well.

(Tr. 430).

---

[1] The court notes that in her decision, the ALJ stated that Dr. Emerson examined the Plaintiff on April 13, 2008. However, Dr. Emerson's records clearly indicate that Plaintiff's April exam by Dr. Emerson occurred on April 13, 2007. These dates are critical, since Dr. Emerson's opinion that Plaintiff was unable to work came on February 4, 2008, which the ALJ failed to address. In addition, the court notes that neither Plaintiff nor Defendant addressed Dr. Emerson's opinion of February 4, 2008.

At the hearing held before the ALJ on June 19, 2008, Dale Thomas, VE, testified. The hypotheticals and answers to the hypotheticals were presented as follows:

> Q. Let's assume claimant has demonstrated inability to perform work at the medium level; able to lift and carry occasionally 50 pounds, frequently 25 pounds able to sit at least six out of eight hours; stand and/or walk six out of eight hours. And to that we want to add certain mental limitations. The work should be non-complex, simple instructions, little judgment; work of a routine, repetitive-type nature that can be learned by rote, having few variables. There would be no more than superficial contact with the public and co-workers and supervision, which is concrete, direct, and specific. With that type of a residual functional capacity, would there be any impact on the ability to perform nursing, licensed practical nursing?
>
> A. That job could not be performed with those limitations.
>
> Q. And with that residual functional capacity, both physically as well as mentally, what kind of work could a hypothetical individual of the same age, education and work experience as the claimant perform?
>
> A. That person could do production work. The SOC number associated with that group of jobs is 51-9199, and a representative Dictionary of Occupational Titles job title and number for that group of jobs would be for a bench assembler. The DOT number is 706.684-042. There are approximately 300,000 in the nation and 6,300 in the state of Arkansas at an unskilled and light level, which falls within the medium RFC that you've given. So those would be mostly up to a SVP level of two.
> . . .
> Q. And if we were to add to that residual functional capacity, based upon the psychological factors that our hypothetical individual would be off pace one-third of the time and need unscheduled breaks, what would that do to the aforementioned occupations?
>
> A. Those jobs would, would be eliminated.
>
> Q. And can you find any other competitive work at either medium, light, or sedentary?
>
> A. No.
>
> Q. If we were to add to that, for psychological reasons, missing work on a regular and continuing basis two times a month, would that in-and-of-itself have any affect on the ability to perform these production type jobs?
>
> A. In my opinion, that would be, would, would represent excessive absenteeism and, therefore, there would be no jobs that such a person could do.

(Tr. 39-40).

**Applicable Law**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3), 1382(3)(D). A Plaintiff must

show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and, (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity (RFC).  See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**Discussion**

Plaintiff presents six issues on appeal: 1) The ALJ's finding that Plaintiff was not disabled was not based upon substantial evidence;  2) The ALJ did not fully and fairly develop the record;  3) The ALJ erred in disregarding the credibility of Plaintiff's subjective complaints;   4) The ALJ erred in regard to the weight given the opinions of Plaintiff's treating physicians;  5) The ALJ erred in determining residual functional capacity (RFC);  and 6) Plaintiff is presumptively disabled under §12.00, and more specifically §12.04 or §12.06 of the Listing of Impairments.

The ALJ found that Plaintiff had the severe impairment of Mood Disorder.  (Tr. 51).  The ALJ also found that the Plaintiff's alleged heart impairment had no more than minimal effect on Plaintiff's physical ability to do basic work activities, was not expressed in any symptoms, and was

therefore, non-severe. With respect to Plaintiff's hypothyroidism, the ALJ found that it was effectively controlled with the use of medication and had no more than a minimal effect on Plaintiff's physical ability to do basic work activities and was therefore, non-severe.

The ALJ further found that the mood disorder impairment did not meet or medically equal the criteria of listing 12.04, concluding that the "paragraph B" criteria and "paragraph C" criteria were not satisfied. The ALJ therefore concluded that Plaintiff had the RFC to perform medium level work, except that Plaintiff must work where the instructions were simple and non-complex, where there was no more than superficial interpersonal contact with co-workers and supervisors, where the complexity of tasks was learned and performed by rote, where the work was routine and repetitive, where there were few variables, where little judgment was required, and where the supervision required was simple, direct, and concrete. (Tr. 53-54). Although the ALJ found that Plaintiff's impairment could reasonably be expected to produce anxiety, paranoia, fatigue and drowsiness, the ALJ found that Plaintiff's statements of intensity, persistence and limiting effects were not credible.

The ALJ failed to address Dr. Emerson's February 4, 2008, opinion wherein she stated that Plaintiff was unable to do any work of any kind, and basically dismissed Dr. Salvator's June 17, 2008 opinion regarding Plaintiff's marked limitations, by referring to it as "[I]nconsistent with repeated reports of progress." "A treating source's opinion is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record." Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003), paraphrasing 20 C.F.R. §404.1527(d)(2). When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider

has about the plaintiff's impairments. 20 C.F.R. §416.927(d)(2)(ii). Additionally, the ALJ must either attempt to reconcile the medical reports of the treating physicians with those of the consulting physicians, or direct interrogatories to each of the physicians to obtain a more substantiated opinion of the Plaintiff's capabilities and the onset of his disabilities. See Smith v. Schweiker, 728 F.2d 1158, 1164 (8th Cir. 1984); O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); Funderburg v. Bowen, 666 F. Supp. 1291, 1298-1299 (W.D. Ark. 1987).

As stated earlier in this opinion, Plaintiff had been seeing Dr. Emerson for ten years and Dr. Salvator for twenty-five years. Their opinions should not be considered lightly, and in the present case, the only individuals who contradicted these treating physicians were Dan Donahue, Ph.D., and Brad F. Williams, Ph.D., both non-examining consultants, who concluded that Plaintiff was not disabled.

**Conclusion**

Accordingly, having carefully reviewed the record, the undersigned recommends that this matter be reversed and remanded, pursuant to sentence four of 42 U.S.C. §405(g), directing the ALJ to submit interrogatories to Dr. Emerson and Dr. Salvator, to ask them to review all of the medical evidence during the relevant time period, and to complete Mental Residual Functional Capacity Assessments. The ALJ should also ask both doctors to state what objective findings they used to support their conclusions. The ALJ may also order a consultative examination, and ask the consultant to complete a Mental Residual Functional Capacity Assessment.

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are**

**reminded that objections must be both timely and specific to trigger de novo review by the district court.**

  Entered this 9th day of December, 2009.

                */s/ Erin L. Setser*
                HON. ERIN L. SETSER
                UNITED STATES MAGISTRATE JUDGE